UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

UNITED STATES

V.                                         CRIMINAL NO. 04 10231 MLW 3

MATT A. HAVEY

### DEFENDANT'S SENTENCING MEMORANDUM

Matt A. Havey ("the Defendant"), in the above-numbered Indictment and through Counsel, submits the following Memorandum for the consideration of this Court upon sentencing.

**Facts.**

1. **Procedural Background.**

The Defendant has been charged in three Counts of the present Indictment – Count one, alleging conspiracy in violation of 18 U.S.C. §371; Count Seven, alleging wire fraud in violation of 18 U.S.C. §1343; and Count Eight, alleging mail fraud in violation of 18 U.S.C. §1341.

The Defendant was first presented to this Court on November 5, 2004, and then again on November 14, 2004 at which time he was placed on pretrial release, with conditions. After the Defendant avoided drug testing over a period of time,[1] he was examined positive for the presence of morphine on November 14, 2005. His bail was revoked on that date, and he has remained in the custody of the United States Marshal since.

---

[1] Pre trial Services apparently did not consider his avoidance – prior to November 14, 2005 – grounds for revocation of his bail.

On June 15, 2006, the Court accepted the Defendant's guilty plea to each of the Counts with which he was charged – Counts One, Seven and Eight.[2]

Sentencing has been set for October 20, 2006.

**2. Personal Background.**

The Defendant is the product of a loving and close-knit family. His siblings are gainfully employed,[3] as is his father. His mother has never worked outside the family home. Although his mother has no identification and cannot do so, the Defendant's father and sister have visited the Defendant regularly since he has been detained in the present matter.

The Defendant, who is 35 years old, and his wife, Cary [Eason], have been together for approximately seventeen years. They have three young children, the older two are school students, the youngest is two years of age. There is no evidence to suggest that the Defendant has been other than a loving and committed family man. He has done his best to provide for his wife and children even when times were difficult for him. Despite the personal troubles he has endured and those confronting him in the instant indictment, his family has always been his first priority. The family bond is such that even while the Defendant has been unable to do so, his parents and siblings provide material and financial assistance to his wife and family.

The Defendant has been gainfully and continuously employed nearly until the time of his detention but for an eight month period in 1999 – 2000, when he collected unemployment insurance, because his employer closed down the business. His last

---

[2] There were six other co-Defendants to this Indictment. Defendant Maggio pleaded guilty in April of this year, the remaining five pleaded guilty in June.

2

job, at North Shore Buick GMC, was terminated in June, 2005, owing to the fact that this business, too, closed down, and through no fault on the part of the Defendant. His health is questionable. He likely has diabetes, although a certainty of diagnosis has yet to be made, and he suffers from an opiate dependency.

Although the Defendant did some drinking in the late 1990s, and used marijuana and cocaine a few times, his real problems with substance abuse began – in 1998 – when he started to use Percocet and Vicodin painkillers. This indulgence led to the use of Oxycontin in 2001 and, finally, heroin in 2004. Fearing the ultimate effects of this sort of drug abuse, he sought treatment in April of 2004 at the Melrose-Wakefield Hospital. He informed his caregivers that he had attempted prior detoxification four times, but was unable to stay clean.

Still afflicted with heroin use in 2005, the Defendant admitted himself to the program at Cambridge Health Alliance on November 10, 2005. There, he was 'detoxed' with the help of the drug suboxone.[4] He was discharged on November 14, 2005, into the custody of the United States Marshal. Despite his foiled attempts at overcoming his drug problem, he was determined to succeed. It may be that his pretrial detention has endowed him with a drug-free period sufficiently long enough to safely distance him from a miserable and debilitating habit. Crime and drug dependency are mutual attractants. Were the Defendant 'clean,' the odds are substantial that his bent towards

---

[3] The Defendant's brother James lives in Pennsylvania, the Defendant was unsure of James' employment status.
[4] Suboxone, perhaps the next generation of methadone-type treatment for opiate dependency, is a "…partial opioid (buprenorphine) and an opioid antagonist (naloxone)… ." The drug reduces cravings and withdrawal symptoms, and blocks the effects of opioids. Walsh SL, Eissenberg T. "The Clinical Pharmacology of Buprenorphine: Extrapolating from the Laboratory to the Clinic." *Drug Alcohol Depend*. 2003; 70 (suppl 2):§§ 13-27.

unlawful activity would disappear, or at least diminish to the point where it could be successfully managed.

### 3. The Defendant's Criminal History.

As the Presentence Report observes, at Paragraph 233, the Defendant has no convictions, scores zero in his Criminal History Computation, and therefore registers in Criminal History Category I. Other than the conduct underlying the Defendant's guilty plea, there is no evidence that he is – or has been – prone to criminal activity. There is no evidence at all that the Defendant has any tendencies toward violence or the use of weapons.

### 4. The Defendant's Offense Conduct.

This Court has heard evidence in support of those allegations in the Indictment against the Defendant sufficient to accept his guilty plea. Additionally, the Probation Department has provided a lengthy and detailed summary of the conduct of *all* the Defendants in this indictment. The Defendant will be brief in this section.

Defendant Peter V. Maggio III ("Maggio") was the undisputable 'mastermind' of the entire scheme, and sub-schemes, charged in the Indictment. Maggio was the subject of three prior, and independent, indictments in this District. The conduct charged in those indictments essentially involved fraud, as does the conduct alleged in the present charging document. On the second of the Indictments, Maggio pleaded guilty and received a sentence of fifty-one months. On the third, he was sentenced to twenty-four months, to run concurrent with the former sentence.[5] Maggio has pleaded guilty to all eleven Counts in the present Indictment, and has yet to be sentenced.

---

[5] On the first Indictment, Maggio was sentenced to ten months of home detention electronically monitored.

A reading of the Presentence Report fact summary yields the clear conclusion that
Maggio – a skilled 'con man' – conceived of the conduct described in the Indictment, orchestrated its execution and methodology, generally oversaw the unlawful projects and profited enormously as a result.

The Presentence Report itself supports these assertions. Maggio created Earth Management & Equipment Co., Inc. and conscripted Defendant Louis A. Paradiso ("Paradiso") as President of the 'shell' company (Paragraph 9). He engaged Defendant Jeffrey A. Deveau ("Deveau") as a salesperson and Defendant William A. Howe ("Howe") – an accountant – to assist in the creation of bogus business records Deveau in turn brought Defendant Michael R. O'Neill ("O'Neill") into the myriad sets of corrupt loan schemes (Paragraph 11). Defendant Sean Sacco ("Sacco") was introduced to Maggio, who put him to work as the holder of a 'straw' bank account, as well as a party to several loans (Paragraph 34). Maggio did all the recruiting, directly or indirectly. He was the idea man and the chief of the operations detailed in the Indictment.

Paradiso introduced the Defendant to Maggio in 1999. At the time, the Defendant was working at Jiffy Lube and was anything but well-to-do (Paragraph 21). Maggio directed him to sign certain loan documents, with the assurance that the underlying monies would be repaid (Paragraph 20). Maggio also told the Defendant to form two 'd/b/a'-type companies, Metropolitan Crushing and Materials and Metropolitan Transportation and Equipment (Paragraphs 21, 22). In a four-month period in 1999, the Defendant was involved in twelve different loans. According to the Probation Department, these amounted to $2,126,802 (Paragraph 23). One of the loans bore a

5

forgery of the Defendant's signature.[6] In forming the companies, "…this meant [the Defendant was] simply following Maggio's instructions…." (Paragraph 21).

During the course of the multiple schemes, the Defendant made deliveries; signed paperwork; lent his name and Social Security number to Maggio for the purposes of obtaining money; and did other 'odd jobs' on behalf of Maggio and at his direction. With respect to the loans in which the Defendant was instrumental, he was at all times under the belief that the monies would be repaid. His belief in Maggio's fiscal legitimacy was such that at one point he brought his own brother-in-law into the scheme (Paragraph 26). None of the proceeds went to the Defendant, nor did he have any legal position or interest in the various companies involved (Paragraph 26). As recompense for his efforts, Maggio paid off certain of the Defendant's debts, amounting to approximately $15,600. The Defendant also received from Maggio a not particularly significant weekly stipend (Paragraph 26).

In short, the Defendant "…merely acted as an errand boy for Maggio." (Paragraph 26).

**Argument.**

The Probation Department has calculated the Defendant's total offense level as 18 (paragraph 230). The base offense level was 6 (Paragraph 221), and the upward adjustment for loss attributable to the Defendant was 11 (Paragraph 222). A total of four points was added for 'Specific Offense Characteristics' (Paragraphs 223, 224), and a downward adjustment of three points was made for the Defendant's acceptance of responsibility. The Defendant's Criminal History Category is I. According to the

---

[6] Paragraph 23, ft 5. This amounted to $125,442.95.

6

Probation Department calculus, the Defendant's sentencing range is 27 - 33 months. The Defendant challenges *both* upward adjustments for Special Offense Characteristics.

### 1. Number of Victims – Former §2F1.1(b)(2).

The sentencing calculus in the Presentence Report is based on the Guidelines in effect at the time of the offense conduct, the Guidelines Manual issued November 1, 1998. This election was made on the premise that the old Guidelines are more beneficial to the Defendant than those in effect now – at the time of sentencing (see Paragraph 217). While the loss calculation under the 1998 Guidelines is indeed more merciful to the Defendant than the later one, such does not seem to be the case with the availability of an adjustment for the number of 'victims.' According to §2F1.1(b) (2) of the 1998 Guidelines, a two point upward adjustment is indicated where the offense conduct involved "…a scheme to defraud more then one victim… ."

Effective November 1, 2001, part F of the Guidelines – Offenses Involving Fraud or Deceit – was deleted and its provisions consolidated with §2B1.1. The Part B analogue[7] to the deleted provision from Part F reads, in pertinent part, "If the offense involved 10 or more victims…increase by two levels." In this case, the newer Guidelines are more beneficial to the Defendant than those in effect at the time of the offense conduct. Under the older Guidelines, the Defendant would be eligible for a two level increase because the offense conduct involved more than one victim. Under the present Guidelines, however, *because there are only eight identified loans and six*

---

[7] §2B1.1 (b) (2).

7

*identified victims*,[8] the two level increase referenced in Paragraph 223 ought not to apply.

Therefore, it should be excluded from the Defendant's sentencing calculus.

### 2. "Sophisticated Means."

The Probation Department also factored a two level enhancement into the Defendant's over all offense level for the use of 'sophisticated means.' U.S.S.G. §2F1.1(b) (5) (C).[9]

In considering this issue, this Court is asked to take into consideration the fact that the offenses of which the Defendant was convicted were not, in and of themselves, 'simple' offenses. In particular, the Defendant was convicted of Count 1 of the Indictment, charging conspiracy; and Counts Seven and Eight, wire and mail fraud, respectively. Each of these offenses requires certain component acts in order for its commission to be complete; there really is no "simple form" to any of the offenses compared, for example, to the offense conduct involved in a car theft or a violent crime. Even if the conduct involved in the convicted offenses may be characterized as implicating 'sophisticated means,' if such steps are necessary to constitute the offense itself, the adjustment under Subsection (C) is not justified. United States v. Bean, 18 F.3d 1379 (7th Cir. 1994). By way of analogy, for example, a defendant convicted of an offense of which obstruction of justice is an integral part cannot also be enhanced under the obstruction provisions of U.S.S.G. §3C1.1. United States v. Irabor, 894 F.2d 554 (2d Cir. 1990); United States v. Werlinger, 894 F.2d 1015 (8th Cir. 1990).

---

[8] The Probation Department, at Paragraph 222, states that ten fraudulent loans are attributable to the Defendant. Only eight, all told, are identified. *And, in any event, there are only six 'victims' identified*.
[9] This Section is from the old Guildelines. The parallel Section, as the Guidelines stand now, is §2B1.1 (b) (9). Its meaning remains the same. (C).

8

Here, there was no evidence of any special device or contrivance on the part of the Defendant, no evidence of any clandestine and labyrinthine scheme on *his* part -- beyond that necessary to the commission of the offense.  Further, such conduct as the Probation Department may characterize as 'sophisticated' is conduct comprehended by the statutes violated.  Further, the Defendant's acts were those of a 'gopher'.  He was an 'errand boy' acting on the instructions of Maggio, the principal in this matter.  Any argument that this Section should apply to the Defendant should fail.

### 3. Post-*Booker* Sentencing.

In March of this year, the First Circuit decided United States v. Jimenez-Beltre, 440 F.3d 514 (1st Cir. 2006), establishing a sentencing protocol "as clearly as can be possible" in the aftermath of United States v. Booker, 543 U.S. 220, 125 S.Ct. 738 (2005).

The beginning of the Court's opinion makes it unambiguous that "*reasonableness*" is the touchstone of post-Booker sentencing.[10]  Hand-in-glove with that precept, the Court found that the United States Sentencing Guidelines were not "presumptively controlling," and that a Guidelines sentence was *not* "per se reasonable." 440 F.3d 518.   Although the Guidelines are not simply "another factor" in the process of disposition, "[they] are still *generalizations*." Id., emphasis in original.

"*Booker's* remedial solution makes it possible for Courts to impose non-guideline sentences that override the guidelines, subject only to the ultimate requirement of reasonableness." Id.

---

[10]  "[S]entences would be reviewable for reasonableness whether they fell within or without the guidelines." Jimenez-Beltre, at 440 F.3d 517.

9

The holding in Booker has permitted the statutory sentencing mandates of 18 U.S.C. "3553 to emerge with new vitality and prominence, where they were, pre-Booker, effectively trumped. Or at least in part neutralized. Indeed, in his concurring Opinion, Judge Torruella states unequivocally:

> Finally, I think it is of *critical importance* that the majority opinion be understood to reinforce our commitment to the statutory requirement that, *in all cases*, district courts must impose sentences that are 'sufficient, but not greater than necessary' to effectuate the goals of criminal punishment, as articulated in 18 U.S.C. § 3553(a). In articulating its reasons for imposing any sentence, the district court must make clear reference to this *central principle*.

Id., at 440 F.3d 521, emphasis supplied.

In *his* Concurring Opinion, Judge Howard put an even finer point on it:

> The so-called "parsimony" provision, which requires that sentences be only as long as necessary to serve the purposes listed in section 3553(a)(2), has received scant attention from courts. Commentators note that this provision " 'is not just another factor' to be considered along with others set forth in Section 3553(a)" -- it sets an independent limit on the sentence a Court may impose.

Id., at 440 F.3d 526, citations omitted. Judge Howard also observed that the "parsimony" provision is the lead-off language in §3553. It is a charter clause, governing those sentencing provisions which follow it.

The Probation Department's calculus of the Defendant's offense level and criminal history score places him in the 27 - 33 month Guidelines range, more than two but less than three years.

The Defendant recognizes and acknowledges the comparative gravity of his offense, and accepts the fact that he is necessarily responsible to this Court and to society for his actions. Even so, he urges this Court to undercut the Guidelines range, which is no longer "presumptive," no longer mandatory.

A strict Guidelines sentence here would be fundamentally unfair, given the Defendant's minor role in the overall scheme. Maggio was the undisputed source of the criminal ideation and the man with the 'contacts' to make the schemes possible. It was also Maggio who saw to the execution of the fraudulent loans and – presumably -- it was Maggio who took the overwhelming share of profits from the financial chicanery. The Defendant did not have the criminal creativity to conceive of the subject schemes, let alone the ability to give them real life success. Yes, he may have understood that questionable loans were conjured from whole cloth, but he certainly lacked a comprehensive grasp of the intricacies and scope of the offenses. He was also lacking the finesse, of his own resources, to find and win over the 'victims' and to keep the schemes in continuous operation. By the Probation Department's own characterization, the Defendant was an 'errand boy,' a pawn who followed the instructions of Maggio.

That the Defendant has been prosecuted, and detained during the course of the present lawsuit, has caused collateral consequences to both him and his family. His reputation is ruined. It will be a long while – if ever – before any employer will place him in a position of trust. He has been separated from his family. His wife and children have had to rely, at least in part, upon public assistance for their maintenance and well-being. His marriage may be in trouble. His parents have suffered the vicarious shame of their son's detention and metamorphosis into a public outcast, a common criminal.

Although these factors are not uncommon to those in positions similar to that of the Defendant, §3553 requires that each defendant be treated as an individual.[11]  Aside from having fulfilled certain traditional reasons for sentencing, perhaps the only saving grace the Defendant's detention has had is to have kept him drug-free for nearly a year.  This is, however, not insignificant.  If the Defendant stays 'clean' – likely, in the face of the experience of being prosecuted, the odds are in his favor that he will not return to unlawful behavior.  Another factor in favor of the Defendant is the essential absence of a criminal record.  Prior to the present offenses, he has never demonstrated an inclination toward fraudulent conduct.  This is a strong indicator against recidivism.

Finally, the Defendant has a frame of reference for his sentencing, within the case itself.  Co-Defendant Deveau pleaded guilty to Counts One (the conspiracy); Four (wire fraud) and Six (mail fraud) of the Superseding Indictment on June 2, 2005.  On April 10, 2006, Deveau was sentenced to a committed term of one year and one day.[12]

Deveau's position in the overall conduct charged in the Superseding Indictment was very similar to that of the Defendant – essentially a 'gopher,' acting on the instructions and at the direction of Maggio.  Also, Deveau's pleas of guilty to the conspiracy, one count of mail fraud and one count of wire fraud mirrored those offered by the Defendant.  It would follow, in the interests of sentencing uniformity, that the Defendant's sentence should find itself in the same area as that of Deveau.  There having been no substantive or substantial difference between the two, there would be no reason to treat the Defendant fundamentally different from Deveau.

---

[11] As Tolstoy had it, "Each unhappy family is unhappy in its own way."

It would be fair, then, that the Defendant receive a sentence of a year and a day, with a calculus of good time attaching at the time of disposition. But this would require some mathematics by the Bureau of Prisons and some – perhaps unnecessary – paperwork. The same goal would be accomplished by sentencing the Defendant to time served. At the time of disposition, the Defendant will have spent nearly a year in custody on the instant case and would, in any event, be credited with the detention time no matter what the sentence. Since a reasonable commitment would be the same as Deveau's, it follows that a sentence of 'time served' would operate to serve all the ends required by law, and would serve those individual ends required by individual treatment under §3553. Under the circumstances, the Defendant is an excellent candidate for such a disposition.

The Defendant, therefore, for the reasons contained herein, for those reasons which may be adduced at disposition, and for any other reasons this Court may decide in the interests of justice, asks this Honorable Court to sentence him to time served on the Indictment, and no more.

*/s/Roger Witkin*
Roger Witkin
6 Beacon Street, Suite 1010
Boston, Massachusetts   02108
Tel. (617) 523-0027
Fax (617) 523-0024
BBO No. 531780

DATED:     October 9, 2006

---

[12] The term of a year and a day was presumably imposed so that the Bureau of Prisons could factor in a good time credit of forty-seven days.

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

UNITED STATES

V.  CRIMINAL NO. 04 10231 MLW 3

MATT A. HAVEY

CERTIFICATE OF SERVICE

I hereby certify that on this day a true copy of the within document was served upon the attorney of record for the United States, AUSA Victor A. Wild by mail which was e-filed this day.

*/s/Roger Witkin*
Roger Witkin
6 Beacon Street, Suite l0l0
Boston, MA 02l08
Tel. 6l7 523 0027
Fax 6l7 523 2024
BBO No. 53l780

DATE: October 9, 2006