UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES

v.  INDICTMENT NO. 04-10231-MLW

MATT A. HAVEY

**DEFENDANT HAVEY'S SUPPLEMENT TO
HIS SENTENCING MEMORANDUM**

Matt A. Havey ("the Defendant"), in the above-numbered Indictment and through Counsel, submits the following Supplemental Memorandum for the consideration of this Court prior to the Defendant's Sentencing. In doing so, he incorporates by reference the content and argument of his original Sentencing Memorandum.

**Introduction.**

Because there were a number of defendants convicted in this matter, and because this Court is taking pains to provide each such defendant with individual consideration, the disposition process has been protracted.

During the post-conviction phase of the case, the question of sentencing disparity among defendants convicted in a single case was raised. The Court ordered that Counsel brief that issue by November 13, 2006.

**Facts.**

A brief reprise of facts is necessary, not to tax the patience of the Court, but rather to set a context for this instant pleading.

Defendant Peter V. Maggio III ("Maggio") was the undisputable 'mastermind' of the entire scheme, and sub-schemes, charged in the Indictment.[1]  Maggio has pleaded guilty to all eleven Counts in the present Indictment, and has yet to be sentenced.

A reading of the Presentence Report fact summary shows that Maggio – a skilled 'conman' – conceived of the conduct described in the Indictment, orchestrated its execution and methodology, generally oversaw the unlawful projects and profited enormously as a result.

The Presentence Report itself supports these assertions.  Maggio created Earth Management & Equipment Co., Inc. and conscripted Defendant Louis A. Paradiso ("Paradiso") as President of the 'shell' company (Paragraph 9).  He engaged Defendant Jeffrey A. Deveau ("Deveau") as a salesperson and Defendant William A. Howe ("Howe") – an accountant – to assist in the creation of bogus business records.  Deveau in turn brought Defendant Michael R. O'Neill ("O'Neill") into the myriad sets of corrupt loan schemes (Paragraph 11).   Defendant Sean Sacco ("Sacco") was introduced to Maggio, who put him to work as the holder of a 'straw' bank account, as well as a party to several loans (Paragraph 34).  Maggio did all the recruiting, directly or indirectly.  He was the idea man and the chief of the operations detailed in the Indictment.

Paradiso introduced the Defendant to Maggio in 1999.  At the time, the Defendant was working at Jiffy Lube and was anything but well-to-do (Paragraph 21).  Maggio directed him to sign certain loan documents, with the assurance that the

---

[1]  Maggio was the subject of three prior, and independent, Indictments in this District.  The conduct charged in those Indictments essentially involved fraud, as does the conduct alleged in the present charging document.  On the second of the Indictments, Maggio pleaded guilty and received a sentence of fifty-one months.  On the third, he was sentenced to twenty-four months, to run concurrent with the former sentence.  On the first Indictment, Maggio was

underlying monies would be repaid (Paragraph 20).  Maggio also told the Defendant to form two 'd/b/a'-type companies, Metropolitan Crushing and Materials and Metropolitan Transportation and Equipment (Paragraphs 21, 22).  In a four-month period in 1999, the Defendant was involved in twelve different loans.  According to the Probation Department, these amounted to $2,126,802 (Paragraph 23).  One of the loans bore a forgery of the Defendant's signature.[2]  In forming the companies, "…this meant [the Defendant was] simply following Maggio's instructions…   ." (Paragraph 21).

During the course of the multiple schemes, the Defendant made deliveries; signed paperwork; lent his name and Social Security number to Maggio for the purposes of obtaining money; and did other 'odd jobs' on behalf of Maggio and at his direction.  With respect to the loans in which the Defendant was instrumental, he was at all times under the belief that the monies would be repaid.  His belief in Maggio's fiscal legitimacy was such that at one point he brought his own brother-in-law into the scheme (Paragraph 26).  None of the proceeds went to the Defendant, nor did he have any legal position or interest in the various companies involved (Paragraph 26).  As recompense for his efforts, Maggio paid off certain of the Defendant's debts, amounting to approximately $15,600.  The Defendant also received from Maggio a not particularly significant weekly stipend (Paragraph 26).

In short, the Defendant "…merely acted as an errand boy for Maggio." (Paragraph 26).  His place in the enterprise was at the very bottom.  The Defendant has been detained for nearly a year awaiting his fate, with the Government still campaigning for an out-of-proportion sentence.

---

sentenced to ten months of home detention electronically monitored.
[2]   Paragraph 23, ft 5.  This amounted to $125,442.95.

One of the defendants in his matter – Deveau, pursuant to Rule 20 of the Federal Rules of Criminal Procedure – elected to be sentenced for the instant conduct in upstate New York. This particular Defendant was substantially more prominent in the criminal hierarchy than Defendant Havey. Yet, because he 'cooperated,' he received a sentence of one year and one day, which made him eligible for the benefit of 'good time'.

**Argument.**

The Probation Department's final calculus of the Defendant's total offense scores places him in a presumptive sentencing range 27 - 33 months. The Defendant has already challenged these figures as representing a sentence far in excess of any he may have legitimately earned. And, in his present sentencing range, the Defendant faces a possible commitment running fifteen to twenty-one months *beyond* that of Deveau. It does not take a Guidelines-trained person to discern the potential for plain injustice here.

Before Booker,[3] application of the Sentencing Guidelines was mandatory. Although one of the professed Policy Statements in the Guidelines was the reduction of sentencing disparity,[4] this was a concern over national sentencing statistics, not specifically the operation of the individual trial Courts.

Nonetheless, individual sentencing Courts exhibited concern where post-conviction procedures – in a multi-defendant indictment – suggested the possibility of differing treatment for different defendants.

In considering "disparity," the Courts have looked not only at the differences in

---

[3] United States v. Booker, 543 U.S. 220, 125 S.Ct. 738 (2005).
[4] United States Sentencing Guidelines, Ch. 1 Pt. A 3.

4

actual sentences imposed, but also at the conduct of a defendant raising such an issue relative to those others also involved.  For example, in United States v. Bethancurt, 692 F,Supp. 1427, 1433 (D. D.C. 1988), the Court observed

> ...the roles [of the two others]...did not vary so substantially from that of the [subject defendant] that any judge, exercising judicial discretion, would have imposed on the latter *a sentence ten times as long* as that given to the former...
>
> ...yet that is the result...and total lack of proportionality may well offend the Fifth Amendment guarantee of due process.

In United States v. Jackson, 950 F.2d 633, 637, 638 (10th Cir. 1991), the Court denied relief to a defendant premised upon a claim of disproportionality because his conduct in the underlying offense was "significantly disparate" from that of his codefendant which, the Court found, justified the sentence differential.  See also United States v. Nelson, 918 F.2d 1268 (6th Cir. 1990); and United States v. Pierro, 32 F.3d 611, 622 ft. 13 (1st Cir. 1994).[5]  Likewise, in United States v. Butt, 955 F.2d 77, 90 (1st Cir. 1992), a request for a downward departure was denied where "...the codefendants, charged with and convicted of different offenses [from those of the appellant] [were] not '*similarly situated*' with respect to the sentencing guidelines." [Emphasis supplied.] Remarking on disparity, the Court in United States v. Figueroa, 976 F.2d 1446, 1460 (1st Cir. 1992) stated that the Guidelines did not assure uniform sentence treatment for codefendants who exhibited "dissimilar conduct" in the facts of the same case.

In United States v. Mazzaferro, 865 F.2d 450 (1st Cir. 1989), the Court addressed disproportionalities stemming from the same case and, where a defendant received a

5

sentence considerably disparate from that of others, stressed the importance that a sentencing Court make a clear record explaining the distinctions between – or among – the dispositions of the various defendants.

> We think that this requirement for the inclusion of data in the record when an increased sentence is imposed also applies to a situation like the one before us where three defendants are sentenced for the same crime and one is given a much more severe sentence. *See United States v. Capriola,* 537 F.2d 319, 321 (9th Cir. 1976) (*per curiam*) ("When there is substantial disparity in sentences imposed upon different individuals for engaging in the same criminal activity, [where some have pled guilty and others have gone to trial], the preservation of the appearance of judicial integrity and impartiality requires that the sentencing judge record an explanation.")

Mazzaferro, at 865 F.2d 459.

The sense evolving from cases addressing 'disparity' was that in order to receive similar treatment, two -- or more -- defendants in a single case had to be similarly situated virtually 'across the board.'

The matter of United States v. Wogan, 938 F.2d 1446 (1st Cir. 1991) involved two defendants who pled guilty to the same charges. The two were sentenced separately, *Wogan* receiving a substantially higher term than his co-defendant. The Circuit ascribed the difference to mismanagement of the facts prepared by the Government for the respective sentencing procedures. The Trial Court downward departed on *Wogan* to bring his sentence into some relative equivalency with the co-defendant. Upon the Government's appeal, the First Circuit reversed, holding that the Guidelines could not

---

[5] In Pierro, the Court also cited the Wogan finding that a "perceived need to equalize sentencing" does not permit a departure

permit a downward departure simply to bring sentences into line "without more."  At 938 F.2d 1448.[6]

### 3. Post-Booker Sentencing.

In March of this year, the First Circuit decided United States v. Jimenez-Beltre, 440 F.3d 514 (1st Cir. 2006), establishing a sentencing protocol "as clearly as can be possible" in the aftermath of Booker, *supra*.

The beginning of the Court's opinion makes it unambiguous that "*reasonableness*" is the touchstone of post-Booker sentencing.[7]  Hand-in-glove with that precept, the Court found that the United States Sentencing Guidelines were not "presumptively controlling," and that a Guidelines sentence was *not* "per se reasonable." 440 F.3d 518.   Although the Guidelines are not simply "another factor" in the process of disposition, "[they] are still *generalizations*." *Id*., emphasis in original.

"*Booker's* remedial solution makes it possible for courts to impose non-guideline sentences that override the guidelines, subject only to the ultimate requirement of reasonableness." *Id*.

---

[6]  In reciting this near-mandate, The Wogan Court did not disenfranchise the trial Courts from correcting disparities.  Those Courts "...are not precluded *as a matter of law* from departing from the guidelines in order to generally conform one coconspirator's sentence to the sentence imposed on his co-conspirators." Wogan, at 938 F.2d 1448, citing to United States v. Nelson, 918 F.2d 1268, 1273 (6th Cir. 1990), and referencing United States v. Daly, 883 F.2d 313, 319 (4th Cir. 1989).  The phrase "without more" is not defined by Wogan, but suggests the inclusion of facts supporting the correction. And, as a matter of Statute, sentencing Courts are required to consider "the need to avoid unwarranted sentence disparities among defendants who have been found guilty of similar conduct."  18 U.S.C. §3553(a)(6).

[7]  "[S]entences would be reviewable for reasonableness whether they fell within or without the guidelines." Jimenez-Beltre, at 440 F.3d 517.

The holding in Booker has permitted the statutory sentencing mandates of 18 U.S.C. §3553 to emerge with new vitality and prominence, where they were, pre-Booker, effectively trumped. Or at least in part neutralized. Indeed, in his concurring Opinion, Judge Torruella states unequivocally:

> Finally, I think it is of *critical importance* that the majority opinion be understood to reinforce our commitment to the statutory requirement that, *in all cases*, district courts must impose sentences that are 'sufficient, but not greater than necessary' to effectuate the goals of criminal punishment, as articulated in 18 U.S.C. § 3553(a). In articulating its reasons for imposing any sentence, the district court must make clear reference to this *central principle*.

*Id*., at 440 F.3d 521, emphasis supplied.

In *his* Concurring Opinion, Judge Howard put an even finer point on it:

> The so-called "parsimony" provision, which requires that sentences be only as long as necessary to serve the purposes listed in section 3553(a)(2), has received scant attention from courts. Commentators note that this provision " 'is not just another factor' to be considered along with others set forth in Section 3553(a)" -- it sets an independent limit on the sentence a court may impose.

*Id*., at 440 F.3d 526, citations omitted.

Judge Howard also observed that the "parsimony" provision is the lead-off language in §3553. It is a charter clause, governing those sentencing provisions which follow it. Clearly, attention to sentence disparity is warranted under these precepts.

Prior to Jimenez-Beltre, however, and perhaps as contributor to its strength, Ferrara v. United States, 327 F.Supp.2d 108 (D. Massachusetts. 2005) was handed

down.  The Ferrara Court considered head on the question of post-Booker disparity questions:

> Section 3553(a)(6) provides that the [sentencing Court] shall consider 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct,'  Thus, since *Booker*, it has been held that sentencing judges are 'no longer prohibited from considering the disparity between codefendants in fashioning a reasonable sentence.' *United States v. Hensley*, 363 F.Supp2d 843, 844-845 (W.D. Va. 2005); *see also United States v. Revock*, 353 F.Supp.2d 127, 129 (d. Me. 2005); *Simon v. United States*, 361 F.Supp.2d 35, 49 (E.D. N.Y. 2005).  In *United States v. Schneiderhan*, 404 F. 3d 73, 83-84 (1st Cir. 2005), the First Circuit was presented with a post-*Booker* argument based on alleged unwarranted disparity between codefendants and did not deem it to be unmeritorious as a matter of law.  Rather, the First Circuit stated that 'we think it evident that the District Court would not have reduced the defendant's sentence for the purpose of eliminating disparity.'  *Id*.

*Ferrara*, at 372 F.Supp.2d 121.[8]

This Court clearly has the authority to sentence without regard to the Guidelines, so long as a reasonable explanation for the sentence exists and is provided.  The only standard of review in sentencing claims in the 'reasonability' of the sentence.  It is also manifest that the court can correct – or to take measures to prevent – a disparity between or among defendants convicted before it, in a single case, who are in background and offense conduct alike.

In the present case, as has already been asserted, a 27-33 month Guidelines range is out of line with any rationale premised on common sense.  But more, in light of Deveau's sentence the Probation Department's sentencing range calculus would

---

[8]  The last line in the indented section may seem confusing.  The *dicta* acknowledging the post-Booker authority of Courts to correct for sentencing disparity are accurate.  The facts in Schneiderhan, however did not present the Court

*exceed* that of Deveau's by fifteen to twenty-one months.  This is not equitable, it should not be countenanced by a Court whose aim it is to do justice.

Deveau's assistance to the government  -- despite the existence of a '5K1.1' motion in his favor -- does not does not alter the fact that his underlying offense conduct was more of an affront to the laws and to society that was the Defendant's.  That is, Deveau's cooperation did not diminish the seriousness of his behavior.  On the same hand, Deveau's Government assistance did not enhance the gravity of the Defendant's misdeeds.  A 5K1.1 is simply a fiction of the Guidelines which permits a reward to whomever gets to the courthouse door first, or to that person with the best story.

The Defendant – 'low man on the totem pole' that he was, had no story, no 'bargaining chips.'  Those can only come from one on the inside of a criminal enterprise, which the Defendant clearly was not.

Ironically enough, Deveau's unburdening brought him into the same humble *stratum* occupied by the defendant.  This is not metaphorically unlike a lushly laden fruit tree, well-picked, which then bears a similarity to its far less productive neighbor.  In that case, it would follow, in the interests of sentencing uniformity, that the Defendant's sentence should find itself in the same area as that of Deveau.  The artificial treatment of Deveau[9] brought him and the Defendant to the same relative footing, and there would be no reason to treat the Defendant fundamentally different from Deveau.

On the other hand, both District and Circuit case have repeatedly held that where a defendant 's criminal conduct, in the same case, has exceeded that of his or co-defendants, his or her commitment will not be adjusted upon grounds of 'sentencing

---

with similarly-situated defendants.  Hence, the line which appears to be at odds with its predecessor language.
[9]   Once again, the facts produce an irony of dubious amusement.  By having  measurably exceeded the Defendant

'disparity.' Here, no matter how honorably the Government characterizes Deveau's cooperation, he is nevertheless no better a man than before he 'saw the light,' and his sentence should not undercut that of the Defendant – in the present circumstances – on *any* ground.

When the Court receives this pleading, it will have been a full year since the Defendant was taken into custody. Even the Court ordered the Defendant to serve a year and a day, the Defendant would derive no good time benefit from the sentence because he will have served the entire commitment, with no chance of relief of so much as a single day. And if the Defendant *were* to receive such a sentence, his Counsel suspects that the paperwork involved with the Bureau of Prisons may retard his release.

Therefore, with good cause, the Defendant makes the reasonable request of this Court that he be sentenced to time served.

/s/Roger Witkin
Roger Witkin
6 Beacon Street, Suite 1010
Boston, Massachusetts   02108
Tel. (617) 523-0027
Fax (617) 523-0024
BBO No. 531780

DATED:  November 13, 2006

---

in the severity of his criminal conduct, Deveau actually benefits himself.

11

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

UNITED STATES

V.   CRIMINAL NO. 04 10231 MLW 3

MATT A. HAVEY

CERTIFICATE OF SERVICE

I hereby certify that on this day a true copy of the within document which was efiled this day was served upon the attorney of record for the United States, AUSA Victor A. Wild by hand delivery and to the United States Probation Department by hand delivery.

                                                     */s/Roger Witkin*
Roger Witkin
6 Beacon Street, Suite l0l0
Boston, MA 02l08
Tel. 6l7 523 0027
Fax 6l7 523 2024
BBO No. 53l780

DATE:  November 13, 2006

Case 1:04-cr-10231-MLW    Document 186    Filed 11/13/2006    Page 13 of 13